THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE BANK FOR SAVINGS IN THE CITY OF NEW YORK, Relator, v. NATHAN L. MILLER, as Comptroller of the State of New York, Respondent.

*Franchise tax on savings banks — they are not charitable corporations — the tax does not deprive them of "the equal protection of the laws" — they are taxable on the accrued interest on investments and on the par value of securities, although they are not worth par.*

When assessing the franchise tax on a savings bank, pursuant to section 187b of the Tax Law (Laws of 1896, chap. 908, as amd. by Laws of 1901, chap. 117), which provides, "Every savings bank incorporated, organized or formed under, by or pursuant to a law of this State, shall pay to the State annually for the privilege of exercising its corporate franchise or carrying on its business in such corporate or organized capacity, an annual tax which shall be equal to one per centum on the par value of its surplus and undivided earnings," interest accrued upon investments, although such interest is not yet due, should be included.

Stocks and bonds owned by the bank should be assessed at their par value although their actual value is less than par.

Savings banks are not exclusively charitable or benevolent corporations, and as those corporations are the only ones which are exempt from taxation by the laws of the State of New York, it cannot be said that the statute imposing a franchise tax upon savings banks unjustly discriminates against them, and, therefore, contravenes that part of the 14th amendment to the United States Constitution which prohibits any State from denying to "any person within its jurisdiction the equal protection of the laws."

The statute cannot be said to effect any discrimination, as it imposes a franchise tax on all savings banks alike.

CERTIORARI issued out of the Supreme Court and attested on the 12th day of July, 1902, directed to Nathan L. Miller, as Comptroller of the State of New York, requiring him to certify and return to the office of the clerk of the county of Albany all and singular his proceedings had in denying the relator's application for a revision and readjustment of an assessment of a franchise tax against the said relator, a domestic corporation, for the year ending June 30, 1901.

The assessment made by him for that year was the sum of $4,610,252.92, and the tax at the rate fixed by law amounted to $46,102.53.

The Comptroller, after hearing the proofs offered by the relator in support of its application for a revision and resettlement of such assessment, determined that the assessment did not include taxes which could not lawfully be demanded, and declined to make any revision or readjustment of the same, and this is the determination which is brought here for review.

*William Greenough* and *George W. Wickersham*, for the relator.

*John Cunneen*, *Attorney-General*, and *William H. Wood*, for the respondent.

CHESTER, J. :

The relator challenges the legality of the assessment of the par value of its surplus and undivided earnings made by the respondent upon the grounds that he improperly included therein, *first*, interest accrued upon investments, but not due or payable on June 30, 1901; *second*, a valuation at par of certain stocks and bonds owned by it when their market value was $296,500 less than such par value, and, *third*, an overvaluation of its banking house and lot of $350,000. It is also urged that the law authorizing the tax is unconstitutional.

The law under which the tax was imposed upon the relator, which is a savings bank organized pursuant to a law of this State, is section 187b of the Tax Law (Laws of 1896, chap. 908), and was added thereto by Laws of 1901, chapter 117. The section is as follows :

" § 187b. Franchise tax on savings banks.— Every savings bank incorporated, organized or formed under, by or pursuant to a law of this State, shall pay to the State annually for the privilege of

**170** PEOPLE ex rel. BANK FOR SAVINGS *v.* MILLER.

THIRD DEPARTMENT, MAY TERM, 1903. [Vol. 84.

exercising its corporate franchise or carrying on its business in such corporate or organized capacity, an annual tax which shall be equal to one per centum on the par value of its surplus and undivided earnings."

The objections urged against the validity of the tax will be considered in the order above mentioned.

*First.* The Comptroller, in my opinion, correctly included in the assessment the amount of interest accrued upon investments, although not yet due. The law requires the assessment to be upon the " par value " of the surplus and undivided earnings of the bank. The term " par value " has such a well-known meaning, not only in commercial and financial circles, but as applied to ordinary and everyday business affairs, that resort to the authorities for a definition would appear to be needless. It is sufficient for the purposes of this case to mention the following authorities which hold that in determining " par value " the interest accrued up to the time of fixing the value must be included with the principal : *Village of Fort Edward* v. *Fish* (156 N. Y. 363); *State of Illinois* v. *Delafield* (8 Paige, 527; affd. *sub nom. Delafield* v. *State of Illinois*, 26 Wend. 192; 2 Hill, 159); *Hogg's Appeal* (22 Penn. St. 479).

The accrued interest is an asset of the bank as well as the principal of the loan upon which the interest has been earned. The Banking Law (Laws of 1892, chap. 689, § 20, as amd. by Laws of 1898, chap. 333) requires banking institutions, in making reports of their condition to the Superintendent of Banks, to state the whole amount of " interest or profits received *or earned.*" That is equivalent to saying that the amount of interest *accrued* should be included in such report up to the date for which it is made. On the other hand, said section requires the amount of dividends credited to depositors to be stated. In arriving at the surplus and undivided earnings, the Comptroller, following the method provided by law with respect to these reports, included in the assets the interest accrued upon investments up to June 30, 1901, and on the other hand included in the liabilities the dividend or interest on deposits declared June 12 and payable July 1, 1901. The difference between the assets and the liabilities, without so including both these items, would not have been a truthful statement of the surplus and undivided earnings of the relator upon June 30, 1901, the date of

the assessment, and the item objected to was, therefore, properly included.

*Second.* It is urged that because section 124 of the Banking Law provides that in determining the per cent of surplus held by a savings bank its interest-paying stocks and bonds shall not be estimated above their par value or above their market value, if below par, the Comptroller erroneously included in the assessment $296,500, the difference between the market and the par value of certain of its stocks and bonds. But that section has no relation to the question presented here, for it simply provides the method of determining when the authorized surplus amounts to fifteen per cent of the bank's deposits so as to require under section 123 of the law an extra dividend to depositors. Section 187b of the Tax Law in question here provides in express terms that the tax shall be charged on the *par* value of the surplus and undivided earnings, and the Comptroller, therefore, properly took that as the basis for the tax instead of the market value. Nor would the relator probably care to have the tax assessed upon the market instead of the par value, in view of the fact that out of investments in stocks and bonds held by it amounting at par on June 30, 1901, to $39,311,000, only $3,900,000 of them had a market value less than their face or par value.

*Third.* The Comptroller included the banking house and lot of the relator in his assessment at a valuation of $750,000. The relator insists that the real value thereof was only $400,000, and that consequently there was an overvaluation of $350,000. The property is situated at the southwest corner of Fourth avenue and Twenty-second street in the borough of Manhattan. It has a frontage on Fourth avenue of ninety-eight feet nine inches and on Twenty-second street of one hundred and thirty-two feet. The building, which is of steel and marble, was completed in 1894. It is one story about sixty feet in height and covers the entire plot of ground except ten feet on the Twenty-second street side. It was constructed with special reference to the needs of the relator and is suitable only for the purposes of a banking house. The lot cost $333,000 in 1892, and the building, including all the furnishings, vaults and fixtures, cost upwards of $400,000, making the total cost of the property $751,301.06. On January 1, 1895, the relator

charged off. $350,000 in this account to profit and loss and has since carried the building and lot on its books at a valuation of $400,000. They were stated at this value in the report to the Comptroller. He was not satisfied with this valuation for the purpose of his assessment, and resort was, therefore, had to testimony given on the question in behalf of the bank and also by an expert employed by the State.

The witnesses on both sides put the value of the property much below its cost, yet the Comptroller has assessed it practically at cost. While it is proper to give due weight to the element of cost in fix-ing the value, that should not control against proof showing a less value. It is well known that a building, especially one constructed for a special purpose, is rarely worth in the market what it has cost to erect it. That appears to be the case here if the evidence on both sides on that question is to be regarded, and the bank, therefore, not desiring to inflate its assets, carried the property upon its books at what its officers considered to be its value. The Comptroller, however, was not bound to take their estimate of its value. But I think he was in error under the circumstances presented here in assessing the property at its cost for in doing so he must have disregarded the testimony on both sides that it was of much less value than that. In fact outside of the proof as to the cost there is no evidence justifying the inclusion of the property in the assess-ment at the value which was placed upon it by the Comptroller. The opinion of the expert called by the relator was that the lot was worth $334,000 and the lot and building $434,000. He fixed $100,000 as the value of the building for old material and not as its value to the bank as a going concern. The expert called by the State testified that land in that neighborhood had increased in value since the bank purchased the property and gave it as his opinion that the lot was worth $390,000 and that the building was worth $200,000 for the purposes of a bank. Manifestly the value of the building as old material should have little weight in fixing the actual value of the property as it existed at the date of the assessment, and when all the evidence in the case on this subject is considered I think such value has fairly been shown to be the sum of $590,000, and that the valuation of the lot and building cannot be sustained on the proof here at a higher sum than that. This involves a reduc-tion in the assessment made by the Comptroller of $160,000.

*Fourth.* The relator finally urges that the statute authorizing the tax contravenes section 1 of the 14th amendment of the United States Constitution which prohibits any State from denying to " any person within its jurisdiction the equal protection of the laws." · The argument in brief is that savings banks are *quasi* charitable and purely benevolent institutions, and that, as under the statutes of New York, all other classes of corporations engaged in benevolent and charitable work are exempt from taxation, the franchise tax imposed upon savings banks is an unjust discrimination against them within the meaning of such amendment. The answer to this is that savings banks are not *exclusively* charitable or benevolent corporations which are the only ones exempt from taxation under the law, nor are they charitable or benevolent corporations at all, in any legal sense or within the meaning of those terms as used in the act exempting such corporations from taxation. (Tax Law [Laws of 1896, chap. 908], § 4, subd. 7, as amd. by Laws of 1897, chap. 371.) It is true that savings banks have been referred to in some judicial opinions as benevolent institutions, and when looked upon as institutions which are a benefit or advantage to their depositors such reference is entirely correct. Instead, however, of their being benevolent and charitable institutions they are primarily organized to encourage thrift and economy in their patrons, with of course a resulting benefit to the community where they are located to the extent that they are successful in promoting these qualities. That the relator is not different from other savings banks in this respect is made entirely clear by the special law or charter under which it was organized (Laws of 1819, chap. 62) where it is said that the act for its incorporation was enacted " for the laudable purpose of encouraging in the community habits of industry and economy, by receiving  *  *  *  such small sums of money as may be saved from the earnings of tradesmen, mechanics, labourers, minors, servants and others."

Again, this franchise tax is laid upon the surplus and undivided earnings of *all* savings banks alike, and for that reason there is no discrimination in the tax. Nor does the requirement of equality and uniformity preclude exemption from taxation. (25 Am. & Eng. Ency. of Law [1st ed.], 61, and cases cited.)

A franchise tax upon the surplus of savings banks was upheld by

the Court of Appeals in *Monroe Savings Bank* v. *City of Roches-ter* (37 N. Y. 365), but the constitutional question raised here was not presented in that case.

If I am correct in the views expressed it results that the Comptroller should have revised and resettled the assessment by reducing it from $4,610,252.92 to $4,450,252.92, and by reducing the tax from $46,102.53 to $44,502.53.

The assessment and tax should be modified accordingly, and as so modified should be confirmed, with fifty dollars costs and disbursements to the relator.

All concurred.

Determination of the Comptroller modified as per opinion, and as so modified confirmed, with fifty dollars costs and disbursements to the relator.