HACKENSACK WATER COMPANY, RESPONDENT, v. BOR-
OUGH OF OLD TAPPAN, A MUNICIPAL CORPORATION,
APPELLANT.

BOROUGH OF OLD TAPPAN, A MUNICIPAL CORPORATION,
APPELLANT, v. DIVISION OF TAX APPEALS IN THE
DEPARTMENT OF THE TREASURY, STATE OF NEW
JERSEY, RESPONDENT.

Argued November 1, 1977—Decided July 24, 1978.

210

Mr. *Marvin H. Gladstone* argued the cause for appellant (*Messrs. Gladstone, Hart, Mandis, Rathe & Shedd,* attorneys).

Mr. *Joseph Keane* argued the cause for respondent Hackensack Water Company (*Messrs. Milton, Keane & Brady,* attorneys; Mr. *Thomas J. Brady* on the brief).

No appearance was made on behalf of the Division of Tax Appeals.

The opinion of the court was delivered by

SCHREIBER, J. This case presents a difficult problem in real property tax valuation involving the assessment under *N. J. S. A.* 54:30A–52 of land beneath a reservoir created and owned by the Hackensack Water Company, a private water public utility. The municipal taxing authority is the Borough of Old Tappan.

I

The background of this controversy is as follows. In the late 1950's, the taxpayer, Hackensack Water Company, purchased 940.805 acres of natural basin property along the Hackensack River in the Borough of Old Tappan. The Company excavated the land and built a dam across the river, creating a reservoir which it called Lake Tappan. The river bed is now located generally in the middle of the reservoir. Part of the reservoir (about 20%) extends into the Township of River Vale, which is adjacent to Old Tappan. The bed of the Hackensack River marks the boundary between the Borough and the Township.

Of the 940.805 acres located in Old Tappan, 424.151 are dry upland, and the remaining 516.654 are submerged under as much as twenty feet of water. The bulk of the land now under water was swamp land before it was excavated and flooded. The 424 upland acres are undeveloped and, according to the taxpayer's testimony, are necessary to maintain the integrity of the reservoir. The dam, built at a cost of several million dollars, is the only structure on the Old Tappan tract.

This litigation began in 1970, when the Company appealed the Borough's 1970 property tax assessment of the Old Tappan tract to the Bergen County Board of Taxation. The County Board reduced the assessment of $7,118,900 to

$3,869,175. The lowered assessment was based on a valuation of the upland acreage at $6500 per acre and of the underwater property at $2500 per acre. The Borough acquiesced in the reduction and assessed the property at the lower amount for the 1971, 1972 and 1973 tax years. The Company, however, appealed the 1970, 1971, 1972 and 1973 County Board determinations to the Division of Tax Appeals. The four appeals were tried together before the Division.

The Company's appeal was limited to the objection that its underwater property had been overvalued. The Division reduced the County Board's assessment from $3,869,175 to $2,835,875. The reduction was based solely on the finding that the 516 underwater acres had a nominal value of $500 per acre. Upon the Borough's appeal, the Appellate Division in an unreported decision adopted the reasoning of the Division of Tax Appeals and affirmed. We granted certification. 73 *N. J.* 61 (1977).

## II

The Hackensack Water Company is a privately owned public utility which furnishes water to approximately 800,000 customers in Bergen and Hudson Counties. It is subject to comprehensive regulation by the Board of Public Utility Commissioners. *In re Public Service Electric and Gas Co.,* 35 *N. J.* 358, 371 (1961). The Company could not, for example, sell the Lake Tappan reservoir without Board approval. *N. J. S. A.* 48:3-7. As a water public utility the Company is subject to "a complete scheme and method" for taxation for public utilities, *N. J. S. A.* 54:30A-49 *et seq.,* under which it pays a percentage of its gross receipts to the State, some of which are then distributed to municipalities in which the company has its facilities. Under the statutory format all real estate must "be assessed and taxed at local rates in the manner provided by law for the taxation of similar property owned by

other corporations or individuals * * *." *N. J. S. A.* 54: 30A–52.

██ Real estate is defined as "land and buildings, but it does not include * * * reservoirs (except that the lands upon which dams and reservoirs are situated are real estate) * * *." *N. J. S. A.* 54:30A–50(b). The problem here, then, is to evaluate the land beneath the reservoir according to the criteria established generally for assessment of real property. The statutory test calls for an assessment of the land at its "full and fair value * * * at such price as * * * [the property] would sell for at a fair and bona fide sale by private contract * * *." *N. J. S. A.* 54:4–23. A fair sale encompasses a transaction between "a buyer willing but not obliged to buy, and a seller willing but not obliged to sell." *Greenwich Tp. v. Gloucester Cty. Bd. of Taxation,* 47 *N. J.* 95, 99 (1966). In applying that test it is appropriate to consider the highest and best use of the property. See *City of Clifton v. No. Jersey Dist. Water Supply Comm'n,* 104 *N. J. Super.* 147, 153 (App. Div. 1959).

██ The parties assumed the highest and best use of the land was for residential development and presented proofs designed to demonstrate value on that basis. However, it was shown that conversion of this reservoir bottom into a tract amenable to suburban living would require a number of costly engineering maneuvers: a dam would have to be dismantled and the water captured by it drained away without flooding the surrounding countryside; millions of cubic yards of landfill would then have to be dumped into the resulting basin to create land suitable for building and high enough to withstand flooding; and the Hackensack River, now stopped up by the dam, would have to be rechanneled, a feat that would cost, according to one expert's estimate, around $5,000,000. The evidence showed that the conversion expense would far exceed the fair market value of residential property in the area. Since property owners cannot be charged with the cost of restructuring their property (property should be valued in the actual condition in which the

owner holds it, *Trustees of Stevens Inst. of Technology v. State Board,* 105 *N. J. L.* 99, 101 (Sup. Ct. 1928), aff'd 105 *N. J. L.* 655 (E. & A. 1929)), the Division's finding that financially it was not feasible to develop the property for residential use was fully supportable in the record.

▆▆ However, the Division ignored basic precepts when it assumed that residential use was the sole guidepost for valuation and that the taxpayer would have been compelled to give its property away for residential purposes. Underlying the settled rule that remote uses are irrelevant, *Div. of Tax Appeals v. Ewing Tp.,* 72 *N. J. Super.* 238, 243 (App. Div. 1962); *City of Clifton v. No. Jersey Dist. Water Supply Comm'n, supra,* is the more basic principle that property valuation should have some relationship to reality, and the reality of the matter is that the land is useful as a reservoir. Therefore, it would have been proper to consider the actual highest and best use of the land, namely as a reservoir in conjunction with the operation of a utility water system.[1]

---

[1]We note that *N. J. S. A.* 54:4–3.3, governing the taxation of municipality owned water supply lands located in other municipalities, requires that such lands be taxed "without regard to any * * * improvements thereon, in the same manner and to the same extent as the lands of private persons * * *." Cases construing that provision, *e. g., Newark v. West Milford Tp.,* 9 *N. J.* 295, 302 (1952); *City of East Orange v. Tp. of Livingston,* 102 *N. J. Super.* 512, 520–530, aff'd 54 *N. J.* 96 (1968), do not control us here. However, our conclusion that it is appropriate to consider the reservoir use of the lands is consistent with Judge Kilkenny's thoughtful discussion of *N. J. S. A.* 54:4–3.3 in *In re Appeal of East Orange,* 80 *N. J. Super.* 219 (App. Div. 1963), which involved Livingston's assessment of a large tract of watershed land owned by East Orange in connection with its water supply business. The evidence demonstrated that the highest and best use of the land was for residential purposes. Judge Kilkenny suggested, however, that if value of the land for water supply purposes had compared favorably with the value for other purposes, such as residential development, evaluation of the land from the standpoint of its availability as a water supply would have been appropriate. *Id.* at 232–234. See *Wanaque v. No. Jersey Dist. Water Supply Comm'n,* 20 *N. J. Misc.* 232, 26 *A.* 2d 569 (State Tax Bd. 1942).

The ultimate inquiry remains — what is the fair market value of the land?

Various methods have been used to ascertain the price which parties would freely fix in the market place. One standard technique is to examine comparable sales. Another is to capitalize income derived from the property. See *Aetna Life Ins. Co. v. City of Newark,* 10 *N. J.* 99, 105–109 (1952) ; *New Brunswick v. State Division of Tax Appeals,* 39 *N. J.* 537, 544 (1963). These approaches are not compatible with the unique problem posed here.

■ In the case of public utilities, in situations in which it is not feasible to evaluate land by utilizing the standard criteria, other factors must be considered. We indicated as much in *Aetna Life Ins. Co. v. City of Newark,* 10 *N. J.* at 109, wherein we cited with approval *Assessors of Quincy v. Boston Consol. Gas Co.,* 309 *Mass.* 60, 34 *N. E.* 2d 623 (Sup. Jud. Ct. 1941). In attempting to ascertain the fair market value of part of a gas company's property located in one municipality, the court acknowledged that profits from a business located upon the land are not a fair measure of the value of the land because financial returns from a commercial undertaking are dependent upon so many factors unrelated to the land itself. 309 *Mass.* at 63, 34 *N. E.* 2d at 626. The court, after stating that it was appropriate to relax the general principle in those instances where, in the absence of such evidence, there would be no proof of the fair market value of the land, made the following pertinent comments:

The subject of the tax is a network of underground pipes used by the company in delivering gas to its customers. There is nothing in the record to indicate that this distributing system could be used for any other purpose and there is nothing to show that, if operation of the system were discontinued, these pipes would have any removal value, although the meters located upon the premises of the customers might have some value if they were disconnected and repossessed by the company. The property was adapted to a single use and its value depended entirely upon a continuance of that use. It would therefore be difficult properly to appraise its value without

considering its use, which was the only element that gave it whatever value it had. The absence of sales of similar property deprived the assessors of resorting to current market prices. Here the company did not have the right of sale that ordinarily attaches to ownership. It could not sell this distributing system and deprive itself of its power to perform its public duties without legislative sanction. [309 *Mass.* at 64, 34 *N. E.* 2d at 627]

The court concluded that financial returns from the use of the property and its cost were two of the controlling factors in fixing a fair price.[2]

The thoughts expressed by the Massachusetts Supreme Judicial Court are peculiarly applicable here. Nothing in the record indicates that the land under the reservoir could be used for any purpose other than a reservoir, the highest and best use of the property. The land was adapted to a single use and its value depends upon continuance of that use. That is the only element shown to have created value in this land.[3]

■■ Consideration of the contribution of this land to the Company's earnings, therefore, becomes relevant. As a public utility, its rates have been fixed by the Board of Public Utility Commissioners. In making that determination the Board has consistently included in rate base the "original cost"[4] of the reservoir land. *In re Hackensack Water Co.,* 1 *N. J. P. U. C.* 2d 76, 92 (1958), rev'd on other grounds 57 *N. J. Super.* 180 (App. Div. 1959), aff'd as modified 35 *N. J.* 239 (1961). In other proceedings the

[2]The court also indicated other elements were age, condition and reproduction cost of the equipment. None of these factors is relevant here.

[3]We do not intend here to disturb the principle that valuation of land for economically feasible uses other than its actual use is appropriate.

[4]Original cost is the cost of the property to the first person who devoted the property to utility service. For a general criticism of the use of net original cost, see D. Eiteman, "Approaches to Utility Valuation for Ad Valorem Taxation," 71 *Pub. Util. Fort.* 19 (May 23, 1963).

Board has also approved the use of original cost for rate making purposes: P. U. C. Dkt. Nos. 663–125 and 666–458, Examiner's Report dated January 30, 1967, adopted by Board, April 7, 1967; P. U. C. Dkt. No. 744–315, Examiner's Report dated January 23, 1975, adopted by Board, February 27, 1975; P. U. C. Dkt. No. 7512–1330, Examiner's Report dated July 8, 1976, orginial cost rate base adopted by Board, August 12, 1976. It is true that rate base is but one factor in determining revenues and much may be lost in the translation of the value of that base by comparison with the market value of the owner's equity. See Samuels, "On the Effect of Regulation on Value," 25 *National Tax Journal* 311, 315 (1972). However, it is probable that a prospective purchaser, public or private, of the system would in computing value include an amount at least equal to the original cost of the land beneath the reservoir.[5] The original cost at least bears some relationship to the value of the reservoir land and it is appropriate to rely upon it in the absence of any other evidence.[6] *Cf. Troy Hills Village v. Parsippany Troy Hills Tp. Council,* 68 *N. J.* 604, 622–623 (1975) (rent control case indicating that public utility precedents are of limited usefulness in determining market value and that meaning of the term "value" must be derived from the purpose for which valuation is being made). We hasten to add that it would have been proper to consider, even under the unusual circumstances of this case, other factors such as the trending of

---

[5] "Original cost" should probably include the associated costs incurred in placing the land in position for its use as a reservoir.

[6] An analogy may be found in eminent domain proceedings when property because of its unusual character has no market value in the traditional sense and there must be resort to other methods. 4 *Nichols, Eminent Domain,* § 12.32 (3d. ed. 1971). See *Pa. Gas & Water Co. v. Pa. Tpk. Comm'n,* 428 *Pa.* 74, 236 *A.* 2d 112 (Sup. Ct. 1967) (land held for reservoir purposes compensated for in condemnation case on basis of cost to replace rather than fair market value because there existed no market for such utility property).

costs incurred in acquiring the land and in preparing for its use as a reservoir. Here the only relevant evidence was that of an expert, a member of a public utility consulting firm, who testified that the original cost of the reservoir land per the Company's books was approximately $670 per acre. Accordingly, the assessed value should be $670 per acre.

As so modified the judgments are affirmed.

HANDLER, J., dissenting. Although I share the frustration of the majority in determining the fair market value of the underwater property of the Hackensack Water Company based upon the record in this case, I would not, to the obvious detriment of the remaining taxpayers of the Borough of Old Tappan, ascribe as the true value of the reservoir land its remote original cost which has no relevance whatsoever to current market value. In doing precisely this, the majority fosters regressive and unsound valuation practices in the field of *ad valorem* taxation. I dissent.

Our statutory taxing scheme makes it quite clear that all real estate of a water utility must "be assessed and taxed at local rates in the manner provided by law for the taxation of similar property owned by other corporations or individuals * * *". *N. J. S. A.* 54:30A–52. It is also made clear that the lands constituting the base or basin of a reservoir constitute real estate for tax purposes. *N. J. S. A.* 54:30A–50(b). Thus, the realty beneath a reservoir by statute must be assessed for taxation as other similar real estate. This, as recognized by the majority, requires assessment at the "full and fair value * * * at such price as * * * [the property] would sell for at a fair and bona fide sale by private contract * * *. *N. J. S. A.* 54:4–23.

Both parties in this litigation shared the assumption that the highest and best use of the land was for residential development. The persuasive proofs disclosed, however, that the cost of preparing the reservoir land for such use would be truly prohibitive, that it would far exceed the fair market

value of residential property in the area. The majority, therefore, soundly accepts the Division's finding that it was not financially feasible to develop this property for residential use, a finding fully supported by the record. *Ante* at 213–214.

The Division of Tax Appeals believed, however, that the only use which it could consider in the assessment of the reservoir property was its hypothetical residential use, even though that use was fiscally totally unfeasible. Confronted by this apparent dilemma, its resolution was completely unsatisfactory: it simply assigned a nominal value, $500 per acre, to the underwater reservoir land.

Although the majority recognizes that the decision of the Division is flawed, it does not improve much upon the resolution or result. The Court's reasoning process is twofold. It determines that for tax purposes the highest and best use of this land is as a reservoir. It observes, fairly enough, that "the reality of the matter is that the land is useful as a reservoir." It then transmutes this simple usefulness into "the actual highest and best use of the land, namely, as a reservoir in conjunction with the operation of a utility water system." *Ante* at 214. The majority concludes that conventional valuation precepts are inapplicable to such reservoir property and assigns a value to the land virtually as nominal and arbitrary as that employed by the Division, namely, its original historical cost of $670 per acre.

The complexity of assessing water reserve property for tax purposes cannot be glossed or finessed. But, it is not as though our courts have never before confronted the problem. It is entirely appropriate, indeed axiomatic, that the actual condition of land in the possession and use of the property owner should be considered in its valuation for *ad valorem* tax purposes. *Trustees of Stevens Inst. of Technology v. State Board,* 105 *N. J. L.* 99, 101 (Sup. Ct. 1928), aff'd 105 *N. J. L.* 655 (E. & A. 1929). This general principle is applicable to the lands of a water supply utility by virtue of the operative taxing statutes mandating that such realty

be taxed in the same manner as other "similar property." *N. J. S. A.* 54:30A–52. It has been recognized, accordingly, that for *ad valorem* tax purposes such property should be categorized in terms of its actual condition and characteristics and that the representative component parts of the various classifications of the lands of the water utility be separately considered and valued. *Newark v. West Milford Twp.,* 9 *N. J.* 295 (1952) ; see also, *East Orange v. Twp. of Livingston,* 102 *N. J. Super.* 512, 520–525 (Law Div.), aff'd 54 *N. J.* 96 (1968).

The majority, it seems, loses the distinction for tax purposes between considering the actual condition in which land is held by the owner and its highest and best use. *In re Appeal of East Orange,* 80 *N. J. Super.* 219 (App. Div. 1963), alluded to in the majority's opinion to support its conclusion that here the highest and best use of the land was as a reservoir, *ante* at 214 n. 1, simply observed that in a given case availability for reservoir use might be appropriate to consider as a highest and best use. It expressed the view, nevertheless, that although the actual physical condition of the realty held by East Orange as a municipally-owned water supply would naturally include its aquifer characteristic, the actual use of the property as a water supply project did not call for any special increment of value. The Court stressed that the critical factor in determining taxable value is the availability or fitness for a potential use, rather than an existing actual use for a particular purpose. *Id.* at 231; *Clifton v. North Jersey District Water Supply Commission,* 104 *N. J. Super.* 147 (App. Div. 1969).

The approach adopted by the majority was rejected by this Court in *Newark v. West Milford Twp., supra.* Assessing reservoir land "as a reservoir in conjunction with the operations of a utility water system", *ante* at 214, is exactly what was proscribed in the *West Milford Twp.* case, viz:

The statute [*N. J. S. A.* 54:4-3.3] impliedly prohibits an assessment of such lands as part of an integrated utility with the re-

sultant increment to the value of such lands because of their integrated use.

[9 <i>N. J.</i> at 302].

It is asserted by the majority that the *West Milford Twp.* case does not control us because it was concerned with the taxation of municipally-owned water supply lands located in other municipalities under *N. J. S. A.* 54:4–3.3 That statute imposes a tax on such water reserve lands "without regard to any * * * improvements thereon, in the same manner and to the same extent as the lands of private persons * * *." This statute is entirely concordant with the statutory standards applicable to this case, *N. J. S. A.* 54:30A–52, which enjoins the taxation of the real property of private water utilities, "in the manner provided by law for the taxation of similar property owned by other corporations or individuals * * *." Thus, the thrust of both statutes is to assure that the taxation of water supply land, whether owned and operated by a municipality or a private utility, is undertaken in accordance with the same standards applicable to other real property. In this design both statutes seek to avoid, inter alia, the exaggerated or inflated valuations which would likely result if water supply realty is not assessed apart from its functional use as an integrated component of an operating utility. *Newark v. West Milford Twp., supra,* 9 *N. J.* at 302.

I agree with the majority that on the record developed below it is not possible to arrive at the fair market value of the underwater property by any of the recognized valuation theories. The parties in this case used the comparable sales method of valuation, which is applicable to lands used for a water supply. *E. g., Newark v. West Milford Twp., supra; In re Appeal of East Orange, supra.* This approach did not suffice, however, to found fair market value because the cost of preparing the land for its assumed highest and best use for residential purposes exceeded its potential sales price therefor. The capitalization of income approach, see *Aetna*

*Life Ins. Co. v. City of Newark,* 10 *N. J.* 99, 105–109 (1952) ; *New Brunswick v. State Division of Tax Appeals,* 39 *N. J.* 537, 543–544 (1963), is also mentioned by the majority and rejected as inappropriate to a regulated private water utility such as the Hackensack Water Company. *Ante* at 215.

I strongly disagree with the majority's resort to historical original land costs as the sole basis for affixing the fair market value of this reservoir property. Remote acquisition costs of land is *per se* not a felicitous valuation tool. Nevertheless, original costs may be serviceable if in some realistic and substantial manner they reflect present value.

Such a nexus to true value may conceivably exist where the property to be valued consists of depreciable improvements, not land or real estate as such. *E. g., State v. State Board of Tax Appeals,* 134 *N. J. L.* 34 (Sup. Ct. 1946), aff'd 135 *N. J. L.* 481, 482 (E. & A. 1947) (railroad property) ; *Jersey City v. Seaboard Terminal and Refrigeration Co.,* 19 *N. J. Misc.* 178, 17 A. 2d 577 (St. Bd. Tax App. 1941) (buildings) ; *State ex rel. Mitchell Aero Inc. v. Board of Review of Milwaukee,* 74 *Wis.* 2d 268, 246 *N. W.* 2d 521 (Sup. Ct. 1976) (buildings) ; *Fairchild-Hiller Corp. v. Supervisor of Assessments,* 267 *Md.* 519, 298 *A.* 2d 148 (Ct. App. 1973) (buildings) ; *People ex rel. Bank for Savings in New York v. Miller,* 84 App. Div. 168, 82 *N. Y. S.* 621 (1903) (building) ; *Rego Properties Corp. v. Tax Commission of City of New York,* 34 *A. D.* 2d 574, 309 *N. Y. S.* 2d 775 (1970) (buildings) (*dictum*). This fundamental difference between depreciable and nondepreciable property serves to distinguish the case relied upon by the majority for primary support, *Assessors of Quincy v. Boston Consol. Gas. Co.,* 309 *Mass.* 60, 34 *N. E.* 2d 623 (Sup. Jud. Ct. 1941), which concerned the valuation of street mains, service connections, customers' meters, street lighting, boiler plant and garage and yard equipment.

And even where original cost is regarded as possibly relevant in the circumstances of given cases, it is only where

original cost reflects present value. *New England Power Co. v. Barnet,* 134 *Vt.* 498, 505, 367 *A.* 2d 1363, 1368 (Sup. Ct. 1976) ("[o]riginal cost less depreciation may be a method of arriving at fair market value if it reflects present costs") ; *Jordan Marsh Co. v. Board of Assessors of Quincy,* 368 *Mass.* 322, 331 *N. E.* 2d 61, 62 (Sup. Jud. Ct. 1975) (in valuing a new regional distribution center — depreciation was not a significant factor — "[o]riginal cost, *recently incurred,* was a legitimate factor to be considered in determining fair cash value") (emphasis added).

Even if the reservoir land is considered specialty property,[1] the usual theory employed to value such property is reproduction cost less depreciation and obsolescence. *E. g., Sperry Rand Corp. v. Board of Assessors of Nassau County,* 10 *A. D.* 2d 720, 199 *N. Y. S.* 2d 259 (1960) (buildings) ; *New York Yankees v. Tax Commission of City of New York,* 74 *Misc.* 2d 752, 345 *N. Y. S.* 2d 858 (Sup. Ct. Spec. Term 1973) (Yankee Stadium) ; *Westbury Drive-In v. Board of Assessors,* 70 *Misc.* 2d 1077, 335 *N. Y. S.* 2d 361 (Sup. Ct. 1972), aff'd 45 *A. D.* 2d 821, 356 *N. Y. S.* 2d 1017 (1974) (drive-in theatre) ; *Delaware Racing Ass'n v. McMahon,* 340 *A.* 2d 837 (Sup. Ct. 1975) (racetrack). As is true of cases valuing nonspecialty property, original cost is a factor in determining true value where it reflects present value and it is ostensibly fair to apply such cost as one indicator of value.

The majority does not bother itself with such distinctions. It reasons that the land constituting the base of the reservoir may be considered at its pure original cost because "[t]he land was adapted to a single use and its value depends upon continuance of that use." *Ante* at 216. It goes on to state

---

[1] A specialty is "a structure which is *uniquely* adapted to the business conducted upon it or use made of it *and* cannot be converted to other uses without the expenditure of substantial sums of money" (citations omitted). *Great Atlantic & Pacific Tea Co. v. Kiernan,* 42 *N. Y.* 2d 236, 240, 397 *N. Y. S.* 2d 718, 721, 366 *N. E.* 2d 808, 811 (Ct. App. 1977) (emphasis in original).

"[t]hat [the continued use of the reservoir] is the only element shown to have created value in this land" and that historical cost "becomes relevant" because the land contributes to the Company's earning and the Company's rates are fixed by the Board of Public Utility Commissioners which consistently includes the land at its original cost in the rate base. *Id.*

From the standpoint of sound *ad valorem* tax valuation practices, nothing could be further from the truth. *Woodcliff Lake v. State Bd. of Tax Appeals,* 14 *N. J. Misc.* 132 (Sup. Ct.), aff'd o.b. 117 *N. J. L.* 114 (E. & A. 1936). In instances where such original cost may be said to be "relevant" for purposes of *ad valorem* valuation of utility property, it is never accepted uncritically and without consideration of other pertinent factors. The majority recognizes this when it states "that it would have been proper to consider, even under the unusual circumstances of this case, other factors such as the trending of costs incurred in acquiring the land and in preparing for its use as a reservoir." *Ante* at 217–218. However, inexplicably it fails to follow this approach in its application of original costs as the measure of current market value.

The basic assumption in the use of original costs in property tax valuation — that the original cost of the utility property is evidential of its current fair market value — is one which self-destructs with the passage of time. Eiteman, "Approaches to Utility Evaluation for Ad Valorem Taxation," 71 *Pub. Utilities Fortnightly* 19, 20 (No. 11 May 23, 1963) ; see *New England Power Co. v. Barnet, supra.* Nevertheless, in this case the Court uses the original purchase price of $670 per acre because there is no other satisfactory evidence of the fair market value of this land. I cannot acquiesce in this passive, wrong and purely expedient result. It is grossly unjust to the municipality and its taxpayers to tilt the tax burden so sharply away from the utility. This counters the statutory design of requiring that all relevant factors be brought to bear upon the valuation of utility prop-

erty to the end that neither the utility taxpayer nor other municipal taxpayers are visited with the unbalanced consequences of the valuation of the utility's property which is unrealistically high or low. *Newark v. West Milford Twp., supra.*

I would remand this matter to the Division of Tax Appeals for a redetermination of the fair market value of the underwater reservoir acreage. The parties should be instructed to marshall additional evidence bearing upon the market value of the land. To the extent there is expert evidence introduced with respect to historical acquisition cost, such evidence must include factors to show that such costs can be related meaningfully to *present* market value. Eiteman, *supra,* 71 *Pub. Utilities Fortnightly* at 20.

I would also instruct the Division of Tax Appeals and advise the parties that administrative notice is to be taken of two unreported cases of the Appellate Division, each dealing with tax appeals involving Hackensack Water Company with respect to its reservoir land. These are *Hackensack Water Co. v. Township of River Vale* (A–1716–72) and *Hackensack Water Co. Borough of Woodcliff Lake* (A–550–69). Since these decisions are binding upon the Division of Tax Appeals, administrative thereof is appropriate to the same extent and with the same effect as pertinent statutes and the rules and regulations of the agency. *N. J. S. A.* 52: 14B–10. In each case, the Appellate Division correctly and emphatically rejected the use of the recorded acquisition cost, the purchase price of the land, for rate-making purposes as having no probative value in calculating the tax assessment. In the *River Vale* case there was an appeal from the Division of Tax Appeals concerning the tax valuation of the same reservoir property, the bed of Lake Tappan, as is involved in this case but situate in the adjoining municipality. The court exercised its original jurisdiction and determined the taxable value of the underwater bed was $2,500 per acre. This, it may be noted, was approximately $2,000 less per acre than the value of $4,500 per acre given to the dry up-

land area in its natural state. The other case, *Woodcliff Lake,* involved the valuation of reservoir land the bulk of which was under water. The court determined the true value of the reservoir acreage under water at $3,000 per acre in contrast to $4,400 per acre assigned to the upland. Administrative notice of these determinations is highly relevant in this case since the taxpayer's expert here valued the upland property in its aggregate at $1,812,068 or an average of $4,273 per acre, which is fairly approximate to the upland valuations of $4,500 per acre and $4,400 per acre respectively in the *River Vale* and *Woodcliff Lake* decisions. A comparable reduction in those cases (between $1,400 and $2,000 respectively) to reflect the lesser value of the underwater land would produce a tax value of the property in this case ranging from $2,800 and $2,200 per acre. The parties should, of course, be given the opportunity to test the soundness of the valuations in these unreported cases and to contest their evidential use and applicability here. Nevertheless, the Division should give weight to the fact that in the *River Vale* case, Hackensack Water Company did not quarrel with the valuation and the court found evidential support in the record therefor.

For these reasons, I dissent. Justice SULLIVAN and Justice PASHMAN join in this dissent.

*For affirmance as modified*—Chief Justice HUGHES and Justices MOUNTAIN, CLIFFORD and SCHREIBER—4.

*For reversal*—Justices SULLIVAN, PASHMAN and HANDLER —3.