HACKENSACK WATER CO., PLAINTIFF, v. BOROUGH OF HAWORTH, DEFENDANT.

BOROUGH OF HAWORTH, PLAINTIFF, v. HACKENSACK WATER CO., DEFENDANT.

Tax Court of New Jersey

April 1, 1980.

---

John P. Wallace for Hackensack Water Co.

Kent A. Losche for Borough of Haworth.

EVERS, J. T. C.

This case involves appeals and cross-appeals from Bergen County Tax Board judgments for the years 1972 through 1976 concerning the value of approximately 434.48 acres of land and improvements owned and operated as a reservoir by the Hackensack Water Company (Company) in the Borough of Haworth (borough). During the course of the trial, the company withdrew its 1972 and 1973 complaints. It further sought to amend its 1974, 1975 and 1976 complaints by adding allegations of discrimination in assessments thereto. Following the conclusion of the trial the company's motion to reopen the matter to allow testimony in accordance with the Supreme Court decision in *Old Tappan v. Hackensack Water Co.*, 77 *N.J.* 208, 390 *A.2d* 122 (1978) was granted.

The assessment history and county board action is as follows.

| BLOCK/LOT | ASSESSMENT | COUNTY BOARD 1972–1973 | COUNTY BOARD 1974–1975–1976 |
|---|---|---|---|
| Bl. 1A, B, C & D–1 | $ 573,400 | $ 365,700 | $ 975,040 |
| Bl. 3–1 | 143,700 | 143,700 | 186,120 |
| Bl. 3–2 | 16,000 | 7,800 | 16,000 |
| Bl. 4–1 | 160,100 | 154,800 | 484,250 |
| Bl. 4–1A | 4,000 | No appeal | 26,250 |
| Bl. 56–1 | 21,200 | 21,200 | 21,200 |
| Bl. 5–1 | 1,199,900 | 1,037,100 | 1,901,250 |
| | $2,118,300 | $1,730,300 | $3,610,100 |

All county board judgments were appealed initially by the company, while the borough appealed only the 1972 and 1973 actions with respect to Block 1A–1—Lot 1, Block 3–Lot 2, Block 4–Lot 1 and Block 5–Lot 1.[1] Therefore, the Company having withdrawn its 1972 and 1973 appeals, the county board judgments with respect to Block 3, Lot 1 ($143,700) and Block 56, Lot 1 ($21,200) are no longer in issue as there is no appeal from

---

[1] All Borough appeals were brought on behalf of the governing body; not by the assessor.

either party therefrom. By virtue of the borough appeals from the balance of the 1972 and 1973 county board judgments, those actions are still in issue even though the Company withdrew its complaints.

■ The company's motion to amend its complaints to include an allegation of discrimination must be denied. It is well settled that discrimination must be alleged in the initial complaint. Additionally, there was no evidence that the issue was raised before the county board. Discrimination is a new cause of action and cannot be permitted after the time within which suit must be commenced has expired. *Continental Paper Co. v. Ridgefield Park*, 122 *N.J.Super.* 446, 300 *A.2d* 850 (App.Div. 1973); *Cleff Realty Co. v. Jersey City*, 41 *N.J.Super.* 465, 125 *A.* 2d 423 (App.Div.1956), certif. den. 23 *N.J.* 58, 127 *A.2d* 227 (1956); *Matawan v. Tree Haven Apartments, Inc.*, 108 *N.J.Super.* 111, 116, 260 *A.2d* 235 (App.Div.1969).

These lands are part of the 2,935-acre Hackensack Water Company reservoir located in Haworth, Oradell and Emerson, New Jersey, and can generally be classified as underwater, marginal-swampy and uplands. The reservoir portion has a water depth of up to 20 feet and is fed by the Hackensack River and various small streams. The improvements consist of a filtration plant and pumping station. The property is surrounded by unimproved uplands in close proximity to well populated residential communities.

The property is briefly described as follows. The underwater lands consist of 251.73 acres and include portions of Blocks 1A–D, Lot 1 and Block 3, Lot 1. The marginal land, which contains 47.30 acres, is made up of the balance of the above lots and Block 3, Lot 2 and Block 56, Lot 1. The marginal lands consist of the marshy, swampy and embankment areas which surround the underwater lands. The reservoir and marginal lands are surrounded by a fence. Abutting the eastern shore of the reservoir and marginal lands is Lake Shore Road, which is partially improved.

The upland area, which consists of Block 4, Lots 1 and 1A and Block 5, Lot 1 contains 135.45 acres and abuts Lake Shore Road across from the reservoir-marginal lands. The southerly portion (Block 5, Lot 1) is triangular in shape and is approximately 3,000 feet deep at its base (where it fronts on Sunset Avenue) and has a depth of 300 at its northerly apex. This triangular portion contains 96.10 acres of which 40 acres are devoted to pumping station, water filtration and office control uses. The northerly strip (Block 4, Lots 1 and 1A) of the uplands area contains 39.35 acres and has a depth from Lake Shore Road which varies from 300 feet (where it meets the apex of the southerly triangular tract) to 700 feet. To the rear of this strip upland area is an 18-hole golf course located on lands leased from the Company but which are not under appeal. The upland area overlooks the reservoir.

The entire area is zoned for R–40 use which permits the construction of one-family dwellings on one acre lots, with such other permitted uses as churches, schools, public libraries, professional offices and, of course, reservoirs. Water, gas and electric services were available. The borough's testimony suggested that sanitary sewer service would be in effect in about 1975.

As is often the case in such matters, there was a wide divergence in the experts' opinions of value. The borough's estimate of value for each year under consideration was $4,172,-400 while the Company's witness estimated it at $1,661,150. At the original hearing both parties utilized the comparable sales approach to value the land. An analysis of their respective comparable sales indicates that the main area of disagreement was in the value of the underwater lands. In support of their opinions the witnesses referred to various sales of vacant tracts which varied in size from one-acre building lots to parcels in excess of 125 acres. They ranged in price from $5,000 to $75,000 an acre. The transactions took place over a 15-year period. The zoning of the sales lands was also varied.

As to the uplands, the basic value conclusions of the experts, both of whom were well qualified, hardly differed. The Company was of the opinion that the uplands had a base per-acre value of $12,000, while the Borough valued such lands at $12,500. However, while the Borough's expert determined that his estimate reflected the true value and required no further adjustment when applied to the uplands, the company's witness, on the basis of location, accessibility and utility of the subject premises, decreased the per-acre value considerably. A greater discount was applied to the marginal land.

It was the opinion of the company that the underwater lands were without value. The testimony of its appraiser and engineer clearly demonstrated that the cost of reclaiming these lands would far exceed their market value. Accordingly an arbitrary, nominal value of $500 an acre was assigned to the reservoir land.

The borough, while it viewed the highest and best use of all lands under review as being residential, did not employ an approach which would convert the underwater-marginal lands to a dry, developable tract. In its approach to value it would develop the 135.45-acre upland tract into a lake community while leaving the reservoir-marginal area in its natural state. While its witness could not compare such hypothetical development with any existing developments, he declared that based upon his past experience and expertise, such a community was entirely feasible. According to the witness, the existence of the lake would enhance the value of the other acreage by approximately one-third. In lieu of assessing zero value to the lake area, he kept his base upland value at $12,500 per acre and attributed a one-third increase, or $4,150 an acre to each acre of the 299.03 acre reservoir-marginal land area.

This privately owned water utility company property is to be assessed pursuant to *N.J.S.A.* 54:30A–49 *et seq.*, which provides that all real estate must "be assessed and taxed at local rates in the manner provided by law for the taxation of similar property owned by other corporations or individuals . . . ." *N.J.S.A.*

54:30A–52. Real estate is defined as "land and buildings, but it does not include . . . dams and reservoirs (except that the lands upon which dams and reservoirs are situated are real estate) . . .." *N.J.S.A.* 54:30A–50(b). This method of assessment seeks to avoid exaggerated or inflated valuations which could conceivably result if water supply real estate was assessed as an integrated component of an operating utility. Such a result would tilt the tax burden in favor of otherwise similarly situated landowners who are not subject to the comprehensive regulation by the Board of Public Utilities Commissions and who could buy and sell property subject only to market conditions. The Company, for example, could not sell the Oradell reservoir without Public Utility Commission approval. *N.J.S.A.* 48:3–7. Conversely, it would be expected that such treatment would not result in an unwarranted favorable tax position for utility companies.

█ Since the lands must be assessed in the same manner and to the same extent as lands of private persons, the assessment must be made in accordance with *N.J.S.A.* 54:4–23, which provides that the true value test is what "the property" would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments . . . .." True value is the value the property has in exchange for money. *Hackensack Water Co. v. Division of Tax Appeals*, 2 *N.J.* 157, 163, 65 *A.*2d 828 (1949).

Perhaps because the results of strict observance of the statutory mandates in the valuation of underwater lands seemingly bore no resemblance to the happenings in the real world of the market place, previous decisions of the reviewing authorities have produced widely divergent values for such lands. A brief review of the valuation of company underwater lands, all of which are part of the same watershed and in close proximity to each other, is revealing.

An assessment of $2,500 an acre for 1969, 1970 and 1971 of the subject lands was affirmed by the county board. The Division of Tax Appeals found the true value also to be $2,500 an acre

which finding was affirmed by the Appellate Division in an unreported decision. A 1969 appeal concerning such lands in nearby Woodcliff Lake resulted in a Division of Tax Appeals judgment of $3,000 per acre. In 1970 the Division of Tax Appeals found the Company's underwater lands in River Vale to have a value of $2,500 per acre. The Appellate Division, although initially remanding the matter to the Division of Tax Appeals for further findings, in an unreported decision exercised its original jurisdiction and determined the per acre value to be $2,500.[2]

In the 1970–1973 appeals of Company lands in the Borough of Old Tappan, where the underwater lands formed the bed of Lake Tappan which is the same body of water considered in the River Vale matter, the Appellate Division, in an unreported decision, affirmed the judgment of the Division of Tax Appeals where the value was found to be $500 an acre. The Supreme Court granted certification. *Hackensack Water Co. v. Old Tappan*, 73 *N.J.* 61, 372 *A.2d* 326 (1977).

The Supreme Court, *Hackensack Water Co. v. Old Tappan*, 77 *N.J.* 208, 390 *A.2d* 122 (1978), after agreeing that the record fully supported the Division of Tax Appeals finding that it was not financially feasible to develop the property for residential use because the conversion expense would far exceed the fair market value of the property, noted:

> . . . The Division ignored basic precepts when it assumed that residential use was the sole guidepost for valuation and that the taxpayer would have been compelled to give its property away for residential purposes. Underlying the settled rule that remote uses are irrelevant * * * is the more basic principle that property valuation should have some relationship to reality, and the reality of the matter is that the land is useful as a reservoir. Therefore, it would have been proper to consider the actual highest and best use of the land, mainly as a reservoir in conjunction with the operation of a water utility system. [at 214, 390 *A.2d* at 125.]

The court, after rejecting the use of the comparable sales and income approaches as being incompatible with the unique problems presented allowed that other factors must be considered.

---

[2]The Division of Tax Appeals Judge had retired.

It noted (at page 216, 390 *A*.2d at page 126), "Nothing in the record indicates that the land under the reservoir could be used for any purpose other than a reservoir, the highest and best use of the property. The land was adapted to a single use and its value depends upon continuance of that use. That is the only element shown to have created value in this land." It concluded that a consideration of the contribution of the land to the company's earnings was therefore relevant. It noted that original cost, which it defined as "the cost of the property to the first person who devoted the property to utility service", was included by the Board of Public Utility Commissioners for rate-making purposes. While acknowledging that rate base is only one factor in determining revenue, it nevertheless held (at 217, 390 *A*.2d at 127), ". . . it is probable that a prospective purchaser . . . would . . . include an amount at least equal to the original cost of the land beneath the reservoir." It concluded that the original cost bore some relationship to the reservoir land and that it was appropriate to rely upon it in the absence of any other evidence. The court added (at 217, 390 *A*. 2d at 127), that "it would have been proper to consider * * * other factors such as the trending of costs incurred in acquiring the land and in preparing it for its use as a reservoir." The court found that the only relevant evidence was the original cost of the underwater lands as shown on the company books of $670 an acre. The judgment of the Division of Tax Appeals of $500 for underwater lands was thus increased to $670 an acre.

While it is unclear whether the Supreme Court intended that the original cost of all land—upland, marginal and underwater, as well as those lands located in other taxing districts—should be considered in attempting to determine value, the testimony offered following the company's successful motion covered the spectrum. According to the company's records, the original cost of the subject property, purchased during the 1914–1951 period, was minimal. In fact, the underwater lands, purchased in 1914, are carried at a book cost of $337 an acre, which cost also pertained to 35 acres of upland acquired at the same time.

The borough's valuation process included the trending of the original cost of land and improvements. It utilized an original per-acre cost of $900. based on the original purchase price for all property, including that in other municipalities, located in the Oradell reservoir. The original cost was trended for 58 years at a 4% rate (a 9.725 trend factor) indicating a land value of $8,750 an acre. This 4% figure was derived through a comparison of the subject 1914 purchased price and two isolated sales of property many years thereafter. The borough found these sales indicated a yearly advance well in excess of 4% but settled on 4% based on the studies compiled by the *Engineering News Record.* Improvements to the entire Oradell reservoir, which originally cost $2,755,218.57, were trended based on a factor of 9.48, which factor was also derived from the *Engineering News Record.*[3] The total trended cost of the improvements was calculated at a per-acre rate of $10,500. Based on a trended cost it was the Borough's opinion that the land value was $4,400,300 and improvements $4,337,200 for a total value of $8,737,500, ($17,632 an acre) for the property in Haworth.

■ The trended original cost methodology employed by the borough is found to be unreliable. In addition to (for these purposes) the deficiencies inherent in the *Engineering News Record* studies, the borough expert admitted that he had no personal knowledge on which to base his comparisons of the 1914 acquisitions and the lands to which they were compared a half-century later. He further acknowledged that had he had the requisite information, he would have preferred to have trended the original costs from the date of acquisition of each parcel[4] to the critical assessing date. Admittedly, according to

---

[3]The *Engineering News Record* indicates basic trends in construction costs in the United States. This index measures the effects of wages and material price trends. It does not adjust, however, for productivity, managerial efficiency, competitive conditions, automation, design changes or other intangibles.

[4]Various parcels were purchased, in addition to the initial 1914 purchases, in the 1920s through 1951.

the witness, this procedure would have been more reliable. Additionally, the borough's witness erroneously included the cost of the dam in trending the improvements which, pursuant to *N.J.S.A.* 54:30A–50(b) is exempt from real property taxation. It is noted further that the $8,737,500 value found by the borough exceeds the original assessment by $6,600,000, and the county board judgment by some $5,000,000. The assessment and judgment included the value of the buildings. Furthermore, the $17,632 an acre value exceeds by $5,000 an acre the value ($12,500) attributed to the superior upland acreage. Thus, in spite of a detailed and thoroughly researched effort, the borough's conclusions must be rejected. However, in the view taken of this case, such shortcomings are not fatal. Still to be analyzed is the company's testimony which consisted of nothing more than a reference to its untrended original acquisition costs of the raw land.

█ Original costs may have some semblance of reliability to present true value if, in some sensible, realistic and substantial manner, they reflect true value. For example, such reliability may exist where the subject property consists of depreciable property. *E. g.*, *State v. State Board of Tax Appeals*, 134 *N.J.L.* 34, 45 *A.*2d 599 (Sup.Ct.1946), aff'd 135 *N.J.L.* 481, 482, 52 *A.*2d 852 (E. & A.1947) (railroad property); *Jersey City v. Seaboard Terminal and Refrigeration Co.*, 19 *N.J.Misc.* 178, 17 *A.*2d 577 (St.Bd.Tax App.1941) (buildings). If such reliance is to be found in real property valuation, it must be on the basis that the original cost is evidential of the current market value. Such basis is not to be found here where a goodly portion of the subject premises were purchased three score and ten years ago. Where other relevant evidence is available, a struggle to establish 1970 real property values on the basis of 1914 purchase prices is unwarranted.

█ As was the case with the *Old Tappan* experts, the experts here also believed that the only use to which the property could be put was the hypothetical use of devoting the entire premises, including the underwater lands, to residential development.

Given the costs of reclaiming and restructuring these underwater lands, this approach to value is unrealistic and entirely unacceptable. So too, however, are the standard techniques of valuation such as the income and replacement cost approaches. Having determined that the original cost method, trended or untrended, is also inappropriate in these circumstances, the essential inquiry still remains—by what method does one arrive at the true value of this land?

Too often, in such situations, the obvious is overlooked, particularly where, as here, the premises to be valued are not of the usual type. In those unusual cases care must first be taken to define the subject.

The problem here is, and has been, the refusal of taxpayers and taxing districts (and perhaps the court) to recognize that a *reservoir is a lake* (emphasis supplied).[5] It is a lake which is surrounded by marginal lands, by embankments and, if required, man-made structures such as a dam. More often than not it is also surrounded by uplands. Without a lake or a pond—without a body of water—a reservoir has no existence.

A reservoir simply describes a particular use to which the body of water is put just as a shopping center or professional office or factory describes the use to which a structure is devoted. They (the lakes) are susceptible of being bought and sold just as are the structures devoted to commercial or industrial purposes which are often marketed, not for the specific present uses, but for the value of the structure and for the use to which they can be readily converted. Conversion and sale, without destruction and without prohibitive costs, is a fact of life in the market place. In that context the highest and best use of these lands is for residential lake community purposes.

■ A realistic view of the subject property discloses that it is a 251.73-acre body of water surrounded by 47.30 acres of mar-

---

[5]Reservoir; a place where something is kept in store; an artificial lake where water is collected and kept in quantity for use. *Webster's New Collegiate Dictionary* 977 (8 ed. 1979).

ginal land. It is bordered by 135.45 acres of upland situated in a one acre residential zone located in a highly desirable residential area. The land overlooks the reservoir-lake and backs up to a golf course. This land would be serviced by all utilities and, according to the unrefuted testimony, by sanitary sewers at or about the time the dwellings to be constructed thereon would be ready for occupancy. In this posture a per-acre price, without need of adjustment, of $12,500 as found by the Borough is reasonable. Contrary to the position of the company, it is further found that, because of its location with respect to the lake, these 135.45 upland acres have a value at least one-third greater, as urged by the borough, than comparable lots without such a strategic and desirable residential location. This value finds support also in the opinion of the company's expert who estimated the value of lots similarly situated would be substantially increased.

The extra value to the upland area cannot, however, be applied to the 40 acres which are occupied by and exclusively devoted to the pumping station and filtration operations. The value of that acreage cannot be appreciated by the added value brought about by the existence of the lake. However, for the company to acquire that land during the period in question, it would have had to pay $12,500 an acre. I thus find the value of this 40-acre tract to be $12,500 an acre.

The existence of the lake thus results in an added value of $397,709 which is found by increasing the value of the remaining 95.45 upland acres by one-third or an additional $4,166.67 per acre. Applying $397,709 to the 299.03 reservoir-marginal area results in a value of $1,330 an acre. In assigning this value to the lake and marginal lands the approach, but not the methodology, suggested by the borough has been adopted. It is only the total increased value of the upland tract which establishes the value of the underwater and marginal lands and it was thus erroneous for the borough to place the increased value of $4,166.67 on each of the 299.03 acres.

This value conclusion is based partly on the unrefuted testimony of the borough's expert witness concerning the creation, development and sale of a lake and lakeside lots in nearby Upper Saddle River in Bergen County. Additionally, notice is taken of the well known and commonly accepted increases in value of developable tracts which have a view and/or use of a mountain range, ocean, stream or lake. In this age of the high-rise condominium or apartment, greater rental values and sales prices are dictated by the view presented to the user. While perhaps not as frequent in this immediate area as in other nearby communities, particularly in Passaic, Morris and Sussex Counties, the fact that lakes are bought and sold as such and are also developed for residential and/or recreational use, cannot be denied.

Although here the record supports a one-third increase in the value of lands abutting or in very close proximity to a lake, it may be prudent in future valuations of such properties to determine the percentage differences in value between lake and nonlake properties in those regions where developed lake communities are more abundant. While the value themselves would, very probably, not be comparable, the percentage differences would be enlightening. Such a study may also reveal the percentage decreases in lands farther removed from the lake which would be of assistance in determining the added value, if any, to reservoir uplands which are removed from lake views and/or use.

The devotion of this property to a lake community is not a remote use in the sense that such uses are irrelevant to the free market of real property, *Division of Tax Appeals v. Ewing Tp.*, 72 *N.J.Super.* 238, 243, 178 *A.2d* 229 (App.Div.1962), and, indeed, such use does bear a sound relationship to reality as mentioned by the court in *Old Tappan*, supra. The property need not be restructured (property should be valued in the actual condition in which the owner holds it, *Stevens Inst. of Technology Trustees v. State Board*, 105 *N.J.L.* 99, 101, 143 *A.* 356 (Sup.Ct.1928), aff'd 105 *N.J.L.* 655, 146 *A.* 919 (E. & A.1929)).

Except for the usual site improvements, this use requires no costly maneuvers or conversions, as envisioned in *Old Tappan*. It does not bring about a manufactured, hypocritical, unfeasible or expedient result, as is suggested by treatment of such controversies in the past. Nor does it lose sight of the distinction for tax purposes between considering the actual condition in which land is held and its highest and best use. *In re East Orange Appeal*, 80 *N.J.Super.* 219, 193 *A.2d* 377 (App.Div.1963). Furthermore, this method of valuation does not violate the statutory mandate which requires that the property be valued as all others not subject to the rules and regulations governing private water utility companies. *N.J.S.A.* 54:30A–52.

■ The improvements located on Block 5, Lot 1, were constructed in the mid–1960s and consist of an office control building, pumping station filter building and miscellaneous site improvements consisting primarily of paving. It appears that all buildings contain the highest grade materials and are maintained in excellent condition. Since the improvements are special purpose structures which have been designed and are used for water processing, it is found that the comparable sales approach is of little value. In addition, the capitalization of income approach is inapplicable since the water company's income is regulated by the Public Utilities Commission. Moreover, the buildings are designed for a limited purpose and are not readily convertible. Due to the special circumstances in this case, I find the reproduction cost approach is the most reliable indicator of fair value. See *Kearny v. Div. of Tax Appeals*, 137 *N.J.L.* 634, 61 *A.2d* 208 (aff'd 1 *N.J.* 409, 64 *A.2d* 67, 1948).

The company's expert, relying on the *Dodge Building Cost Calculator and Valuation Guide*, determined the reproduction cost of all improvements to be $605,000. The borough's expert, also employing the reproduction cost method but utilizing the *New Jersey Assessors Manual* and [1977] *Marshall Valuation Service* (Marshall & Swift) *Marshall and Swift*, found the value of the improvements to be $658,600.

A review of the testimony indicates that the $53,000 difference in opinion is attributable to the amount of depreciation allowed. It appears that the borough expert depreciated the buildings at 7% and the site improvements by 33⅓%. The company's expert allowed a flat 25% depreciation on the structures and 50% on the improvements. Neither witness explained the reasons for making his respective depreciation allowances. I find an annual depreciation rate of 2.5% to these seven-year-old improvements to be fair and reasonable. A 50% rate will be allowed to the site improvements. The company's base value of the improvements is accepted as representing the more reliable application of the cost approach to value, because these values were based on personal knowledge, experience and company records. The borough admittedly conducted no interior inspection of the structures but relied solely on construction plans and exterior inspection. Applying a 17.5% depreciation rate to the company's base cost of $781,011 the value of the three structures as of October 1, 1971 is $644,334. The site improvement value of $38,500 after allowing 50% depreciation is $19,250. The total value of the improvements is $663,584.

In light of the above findings judgments shall be entered in accordance with the following schedule:

### 1972–1973

| BLOCK/LOT | ACREAGE | PER ACRE VALUE | LOT VALUE |
|---|---|---|---|
| 1A–D1 | 243.76 | $ 1,330 | $ 324,200 |
| 3–1 | 46.30 | | 143,700 * |
| 3–2 | 3.67 | 1,330 | 4,881 |
| 56–1 | 5.30 | | 21,200 * |
| 4–1 | 38.74 | 12,500 | 484,250 |
| 5–1 | 96.10 | 12,500 | 1,201,250 |
| 5–1 | Improvements | | 663,584 |
| | | Total | $2,843.065 |

* County board judgments.

| BLOCK/LOT | ACREAGE | PER ACRE VALUE | LOT VALUE |
|-----------|---------|----------------|-----------|
| | | 1974–1975–1976 | |
| 1A–D1 | 243.76 | $ 1,330 | $ 324,200 |
| 3–1 | 46.30 | 1,330 | 61,579 |
| 3–2 | 3.67 | 1,330 | 4,881 |
| 56–1 | 5.30 | 1,330 | 7,049 |
| 4–1 | 38.74 | 12,500 | 484,250 |
| 4–1A | .61 | 12,500 | 7,625 |
| 5–1 | 96.10 | 12,500 | 1,201,250 |
| 5–1 | Improvements | | 663,584 |
| | | Total | $2,754.418 |