CONLEY, J.T.C.
In these proceedings the City of Newark seeks a reduction in the local property tax assessments on approximately 18,000 acres of land the city owns in West Milford Township, Passaic County. Essentially undeveloped, the land comprises much of the watershed that feeds Newark’s reservoirs and ultimately provides water to consumers in the city. The assessments are at issue for 1976, 1977, 1979, 1981, 1982 and 1983. In the aggregate the assessments for all the blocks and lots involved is very close to $20,000,000 for each year.[1]
The Supreme Court dealt with earlier assessments on the same watershed lands in Newark v. West Milford Tp., 9 N.J. 295, 88 A.2d 211 (1952). As noted in that case, the statute governing the assessment of these properties is N.J.S.A. 54:4-3.3. Insofar as that law applies to publicly-owned watershed *37 lands, it exempts any improvements on those lands. In pertinent part the statute provides as follows:
The lands of counties, municipalities, and other municipal and public agencies of this State used for the purpose and for the protection of a public water supply, shall be subject to taxation by the respective taxing districts where situated, at the taxable value thereof, without regard to any buildings or other improvements thereon, in the same manner and to the same extent as the lands of private persons, but all other property so used shall be exempt from taxation. [NJ.S.A. 54:4-3.3]
The Court held in Newark v. West Milford that this statutory standard “[b]y its very terms ... is expressly in pari materia” with NJ.S.A. 54:4-23, the generally applicable assessment statute, which requires assessments on properties to be made at market value as of October 1 of the pretax year. 9 N.J. at 303, 88 A.2d 211. The Court in that case reversed the assessment determinations that had been made by the Division of Tax Appeals and remanded the matter for a new trial with the following guidance regarding the assessment of Newark’s watershed lands:
The true value of these watershed lands can only be reasonably approximated and will have to be determined by comparison of the representative component parts of the various classifications of the lands, which in the aggregate make the total of 18,548 acres, with the true value of comparable parcels of land owned by private persons adjacent to the watershed or reasonably nearby in the township, measured by the standard of value established by a fair and bona fide sale at private contract.
Such lands need not match exactly as do the parts of a jig-saw puzzle, nor is it necessary to compare for value each and every square rod or acre in this vast tract. The value of the aggregate of these lands may be established by a comparison of a representative number of comparable parcels owned by private persons to an equally representative and comparable number of tracts or parcels in the various classifications of the lands making up the watershed, to the extent that the sum total of such values established will represent such a percentage of the total that the value of the lands of the entire watershed may be reasonably approximated therefrom. [Id. at 308, 88 A.2d 211]
Newark presented its case in accordance with its interpretation of the Supreme Court statement just cited. In essence, Newark’s experts divided the vast landholdings of the city into more manageable parcels for purposes of description and valuation. The division of land was into two basic categories: parcels of 100 acres or more and parcels of fewer than 100 acres. The larger parcels were established arbitrarily, using roadways, *38 the Pequannock River, and block and lot lines from tax maps to separate portions of the tract into relatively contiguous segments. Newark grouped 68 line items comprising 17,000 acres into 26 large parcels, ranging in size from 101 acres to 4,051 acres. The remaining 1,000 acres of the overall tract consisted of 88 line items, each smaller than 100 acres in size. Newark treated these as 88 separate parcels for purposes of its presentation. At trial, Newark offered its proofs first with respect to the 26 large parcels and later with respect to the 88 smaller parcels.
With regard to the 26 large parcels, Newark’s appraiser testified that he found an adequate number of sales of vacant land in West Milford from 1973 to 1984 to form an opinion of the value of Newark’s properties. He reviewed the deed abstracts of “literally hundreds and hundreds of Class I [vacant land] sales” from the relevant years. He found sales involving 7,600 acres of land fairly well distributed over the years 1975 to 1983. To put this in perspective, there are approximately 50.000 acres in West Milford Township, of which Newark owns 18.000 acres. Because he was of the opinion that smaller tracts tend to sell at higher prices per acre than larger tracts, primarily because smaller lots are frequently purchased as house sites, Newark’s appraiser arbitrarily looked first for comparables from among the vacant land sales of 100 acres or more. He then looked at sales in excess of 70 acres and then at those in excess of 50 acres, all without regard to zoning. To broaden his examination he looked finally at sales of 15 acres or more in residential zones which were the same as or more restrictive than those in which Newark’s larger parcels were located.[2] The city’s appraiser said he felt more confident in his valuation analysis having looked at everything that had occurred rather than only at selected sales.
*39 From the data he reviewed, he selected 37 comparable transactions. However, he concluded that it would be unwieldy to compare each of his actual sales to each of the 26 parcels. In order to make the appraisal process more manageable, the appraiser decided to construct a model comparison sale, or a composite sale, from patterns he could identify from the 37 comparables. He felt he could then compare each of the 26 parcels to his model and determine a value for each parcel. He made a number of calculations in the process of developing his model. For example, he examined the significance of various groupings of the comparables, such as those of the largest acreage and those acquired by public agencies for parkland purposes. Taking all of his computations into account, Newark’s appraiser concluded that the 37 comparable sales demonstrated that a model comparable sale had an indicated value of not more than $1,500 per acre.
The appraiser concluded that this value indication for the large parcels was consistent throughout the period in question. He supported this conclusion with graphs displaying the absence of an upward trend in sale prices for large tracts. One of the significant factors holding down an appreciation in sale prices, according to Newark’s expert, resulted from the placement of West Milford in a conversation area in the state development guide plan. The plan was promulgated by the Division of State and Regional Planning in the Department of Community Affairs. Although the plan was not published until 1980 it had obviously been under consideration for a considerable time prior to 1980. Newark’s expert was of the opinion that developers in New Jersey were aware of the development guide plan. He said any who might have been interested in purchasing property in West Milford Township were less interested because of the potential restrictions on development. Furthermore, the expert observed that all of West Milford Township was excluded from the development consequences of the Supreme Court’s low and moderate income housing mandate of Mount Laurel II because the state development guide plan, used by the Supreme Court in its landmark housing opinion, *40 had discouraged growth in the township. Southern Burlington County N.A.A.C.P. et al. v. Mount Laurel Tp. 92 N.J. 158, 215, 456 A.2d 390 (1983). I accept this reasoning and find that there was no significant increase in the value of large parcels of land during the years at issue.
The 17,000 acres which Newark’s expert divided into 26 large parcels encompassed much remote, wooded, hilly land with severe slopes, major rock outcroppings, and wet, swampy areas. Part of the watershed tract crosses the West Milford boundary and is in Vernon Township, Sussex County, as was described more fully by Judge Evers in Newark v. Vernon Tp., 1 N.J. Tax 90 (Tax Ct.1980), aff’d 179 N.J.Super. 332 (App.Div.1981). The model constructed by Newark’s appraiser in the present case had certain hypothetical attributes so that it could be compared to the actual land in the 26 parcels. The model had “little good land” but was not dominated by acute conditions pertaining to soil, water or slope. Some of the actual land owned by Newark is better than the model and some is less desirable from the standpoint of development potential and, thus, market value. The model was deemed to have some reasonable access to smaller roads and to the larger, arterial roads. It also was assumed to have reasonable road frontage with relationship to its size. The zoning applicable to the model was considered to be conservation and R-4, permitting single-family residential development on five- and four-acre lots, respectively. The same zones in fact have existed for all of Newark’s land in the 26 large parcels.
Newark’s appraiser then measured the 26 parcels against his model and made value adjustments for the parcels. The adjustments were based upon the parcels’ comparative proximity to developed areas in the township, access to roads, and soil, water and slope conditions. His ultimate consideration was whether each of the large parcels had more or less utility than his model in terms of development. He described each parcel in the appraisal and in testimony. The appraiser then valued each parcel on an overall basis. The values per acre he assigned to the various parcels were as follows: $500, $600, $750, $1,000, *41 $1,200, $1,500, $1,800, $2,000, $2,250, $2,400 and $3,000. The appraiser attributed the wide range in values to the very nature of the properties he appraised. He said, for example, that he valued a 1,536-acre parcel at $500 per acre because it was dominated by Bearfort Mountain and was located in one of the most mountainous areas in New Jersey, marked by rugged terrain and major rock outcroppings. On the other hand, he valued a 255-acre parcel at $3,000 per acre. This lot had access to a state highway, was near to a developed part of town, was 90% flat and could easily be developed into four-acre residential lots.
The second phase of Newark’s presentation addressed the 88 line items that make up the remaining 1,000 acres of the watershed holdings in West Milford. Many of these small lots are along Route 23, a state highway running generally parallel to the Pequannock River, which forms the southern boundary of the township. The small lots range in size from as little as .0551 acres to 77.72 acres, but most are only a few acres in size. Zoning applicable to the 88 parcels varies considerably, with a number of residential lot sizes permitted and with several commercial and industrial zones, primarily along the Route 23 corridor. According to Newark’s appraiser, who described each lot in detail, quite a few of these parcels are nonconforming lots under the zoning ordinance, often because of inadequate size, and some are located entirely within the floodplain of the Pequannock River. Some lots have no road frontage because they are at the river’s edge and some have no usable road frontage because of steep grades to Route 23. Some lots that are zoned for residential use would be better suited for commercial or industrial uses, in the opinion of Newark’s expert, because they are odd sizes and on the highway. In some instances these lots form the very narrow strip between the highway and the river or even form an island between the north and south lanes of the highway.
Newark’s expert divided the 88 line items into their respective zoning categories for purposes of his appraisal analysis. He said this was more difficult than the usual case because *42 West Milford twice changed its zoning ordinance in significant ways during the years at issue. He compared industrial, commercial and residential sales in West Milford to the 88 smaller parcels according to their zoning categories. In a few instances he assigned a flat, nominal value to pieces of land he found to be virtually unusable because of size, location or physical constraints. He also gave some consideration to the results of his analysis of the larger comparable sales, to the extent that their indicated values had a relationship to the largest of the 88 parcels. Concluding that it would be “too monumental a task” to adjust each individual sale to each of the 88 smaller parcels, Newark’s appraiser looked at the subject lots in groups and determined their respective values by relying on his experience rather than on a grid denoting specific adjustments. His valuations ranged from $100 and $200 for very small and unusable lots to $180,800 for a 60.27-acre piece in a desirable part of the township.
Newark’s appraiser did not adjust the nominal values on the basis of time because these were what he called “flat” values. To some extent, however, he adjusted most of the 88 small parcels for time because in many instances he had to determine a separate value for each of three different zoning classifications. These affected the years 1976-1978, Í979-1981 and 1982-1983. In placing a value on each lot under each of the three zoning provisions, the expert tried to pick the middle value during each period. The expert testified that this methodology was adequate to reflect an incremental increase in value for the small parcels. He found such an increase from class I sales in the sales-assessment studies of the Director of the Division of Taxation for the years 1976 through 1982.
It is important at this point to note that the trial of this case consumed 16 days. The trial of any one of the 156 individual lots at issue could easily have lasted a day or a considerable portion of a day. Much was accomplished in an expeditious fashion and I am satisfied that the approach of Newark’s appraiser to the enormity of this task was sound. He made every effort to “reasonably approximate” the true value of the *43 watershed lands, which is all the Supreme Court said could be done with a property so large. Newark v. West Milford, supra, 9 N.J. at 308, 88 A.2d 211.
It was an essential premise of the appraisal by Newark’s expert that the highest and best use of the subject property was for development in accordance with the applicable zoning ordinances. Thus, he concluded that the highest and best use of the property located within his 26 large parcels was for residential development at varying densities. He concluded that the highest and best use of the 88 smaller parcels was, for the most part, as zoned. However, he also concluded in some instances that the smaller lots were worth more potentially than they were worth as zoned because the zoning prohibited more desirable uses of the property. In some of these situations he adjusted his value conclusions to reflect that variances might be obtained to enhance the value of individual lots.
The appraisal of West Milford Township to the valuation of the 18,000 acres was strikingly different. The Township’s experts premised their separate valuations on a determination that the highest and best use of almost all the land was for “a continuation of its use for water supply purposes.” The appraiser relied for this position on the conclusion of the township’s environmental experts that severe restrictions on development were essential to the maintenance of the exceptional quality of the water in the Newark water supply system. The environmental experts were of the opinion that protected watershed lands were essential to insure “the highest quality of water for human consumption.” Furthermore, West Milford’s position in this litigation was that Newark had no intention of selling any of the property, that “it is highly speculative that any use could be advanced to overcome the essential water supply purpose of the vast bulk of acreage under consideration,” and that “property valuation should have some relationship to reality,” citing West Orange v. Goldman’s Estate, 2 N.J.Tax 582, 587-588 (Tax Ct.1981).
*44 The result of this approach was that West Milford’s appraiser valued.only the 1,500 acres outside of Newark’s drainage areas in keeping with permitted uses for those lands under applicable zoning ordinances. He valued the remaining 16,500 acres as watershed. The other West Milford experts valued the entire acreage only as a watershed.
In valuing the subject property as a watershed, West Milford’s experts employed three methods of valuation. The appraiser used the market data approach to value approximately 16,500 acres of the land at what it would cost Newark to purchase large undeveloped tracts for use as a watershed. He concluded that the 16,500-acre tract had to be valued as one economic unit because it would be used as such if purchased anew. In support of this concept, the appraiser relied upon acquisitions by the State of New Jersey and other public entities for reservoir use as well as for park use and for the preservation of open space. The comparable sales he used for this purpose were located in Passaic, Sussex, Warren, Morris, Somerset and Hunterdon counties. His conclusion from these transactions was that the 16,500-aere watershed portion of the subject property was worth approximately $1,750 an acre as of October 1, 1975, the first assessing date in this proceeding. The appraiser adjusted his value conclusion for each subsequent assessing date by applying an annual upward increase of .approximately 5%.
West Milford next sought to present opinion testimony regarding a trended original cost methodology. See Hackensack Water Co. v. Old Tappan, 77 N.J. 208, 216-218, 390 A.2d 122 (1978); Hackensack Water Co. v. Haworth, 178 N.J.Super. 251, 260-261, 428 A.2d 934 (App.Div.1981), certif. den. 87 N.J. 378, 434 A.2d 1063 (1981). The witness called by West Milford was an expert in the field of water resources planning and management and water resource economics. He intended to explain a procedure by which he would transform Newark’s acquisition costs for the watershed property, going back as far as 1889, into “present worth dollars using an appropriate scaling index.” However, upon an objection by Newark, the court ruled the *45 preferred testimony inadmissible on the grounds of relevancy. Since neither that witness nor any other, including the township’s appraiser, was prepared to offer an opinion that the result of the arithmetic reflected the value of the watershed lands on the assessing dates, it would have been a meaningless exercise.
The third methodology pursued by West Milford was the income approach. West Milford presented an expert in the fields of public utility rates and the purchase and sale of water supply systems who testified to his opinion of the value of the Newark tract. The expert determined a land value by computing the volume of water produced from the watershed lands, determining the rate at which the water would sell to wholesale customers of a water utility, and capitalizing the net income of such a utility. Since the total value derived in this manner represented, to the expert, the estimated value both of the land and of “the non-land items that are a part of the wholesale water supply system,” the expert then factored out the value of the real property and gave his opinion as to that value component alone.
Newark and West Milford agree that the basic dispute in this case involves the highest and best use of the subject property, at least with respect to the 16,500 acres in Newark’s drainage area. The concept of highest and best use has been addressed by our court in valuation cases before:
Fundamentally, value is dependent on use. Any parcel of land should be examined for all possible uses and that use which will yield the highest return should be selected. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 th ed. 1978) at 43. This concept or theory is known as “highest and best use” and has been defined alternately as “the use that at the time of appraisal is the most profitable likely use” or “the available use and program of future utilization that produces the highest present land value”. Ibid. Highest and best use contemplates a use which will fully develop land potential. Id. at 136. However, highest and best use considerations have as a prerequisite a probability of achievement. The projected use cannot be remote, speculative or conjectural. Id. at 138. [Inmar Associates, Inc. v. Edison Tp., 2 N.J.Tax 59, 64-65 (Tax Ct.1980) ]
See West Orange v. Goldman’s Estate, supra, 2 N.J.Tax at 587-588.
*46 Application of the highest and best use concept in this case is not difficult. Newark’s expert determined a value for the subject property in accordance with its use potential under the local zoning ordinances. This is a traditional and accepted approach. As the court stated in Inmar Associates, supra, “It is well known that zoning may substantially increase or decrease the value of property because of the allowance or limitation of uses within a particular zone.” 2 N.J.Tax at 65.
On the other hand, West Milford’s experts used the concept in a novel and inappropriate manner. The township’s appraiser testified that his opinion as to highest and best use was influenced to a large extent by three factors: a) recent case law holding that a property’s highest and best use could be for watershed purposes; b) tenets of law and public policy requiring a continuation of the land’s use for water supply purposes; and c) the actual use of the subject property for watershed purposes and Newark’s declared intention to continue its use of the land for watershed purposes. None of these reasons withstands analysis.
The recent cases relied upon by West Milford do not stand for the proposition that the highest and best use of a municipally-owned property can be as a watershed. The cases cited by West Milford for this principle are Hackensack Water Co. v. Old Tappan, supra, and Hackensack Water Co. v. Haworth, supra.
Old Tappan dealt with a 517-acre reservoir (with a depth of as much as 20 feet) and 424 acres of surrounding upland necessary to maintain the integrity of the reservoir. The taxpayer was a privately-owned public utility which could not sell its property without approval of the Board of Public Utility Commissioners. The parties in Old Tappan had proceeded on the assumption that the highest and best use of both the underwater land and the upland had been for residential development. However, citing the basic principle that property valuation should have some relationship to reality, the majority of the Court said, “[I]t would have been proper to consider the *47 actual highest and best use of the land, namely as a reservoir in conjunction with the operation of a utility water system.” 77 N.J. at 214, 390 A.2d 122. The majority then held that the “standard technique” of examining comparable sales was “not compatible with the unique problem posed here,” presumably because the taxpayer could not legally sell its property in the marketplace. Id. at 215, 390 A.2d 122. Again, the Court majority stated emphatically:
Nothing in the record indicates that the land under the reservoir could be used for any purpose other than a reservoir, the highest and best use of the property. The land was adapted to a single use and its value depends upon continuance of that use. That is the only element shown to have created value in this land. [Id. at 216, 390 A.2d 122]
It is clear from the majority’s opinion in Old Tappan that its entire focus was on the land under water. The underwater lands in the present case are de minimus. No mention is made in Old Tappan of the 424 acres of upland, except that it existed. The Old Tappan opinion, therefore, does not support a conclusion that the many thousands of acres of upland in the present case must be valued in any particular manner. Furthermore, Newark is obviously not a privately-owned water company and is not as tightly regulated as the Hackensack Water Company with regard to buying and selling its lands in the marketplace. In fact, the city has on occasion done so. Accordingly, the principles enunciated in Old Tappan are not pertinent here.
The other opinion relied on by West Milford is the Appellate Division decision in the Haworth case. There, the court considered the valuation of 252 submerged acres constituting a reservoir, 47 acres of marsh surrounding the reservoir, and 135 acres of upland. Judge Evers of the Tax Court had expressly found that the upland acreage: a) was situated in a one-acre residential zone located in a highly desirable residential area; b) had road frontage and abutted a golf course; and c) had available water, gas and electric service and would soon have sanitary sewer service. Hackensack Water Co. v. Haworth, 1 N.J.Tax 73, 78, 86 (Tax Ct.1980). Nonetheless, on appeal the Appellate Division found it could not accept the Tax Court’s *48 conclusion that “use of the uplands for residential purposes reflects a reasonable expectation in the near future.” 178 N.J.Super. at 259, 428 A.2d 934. The implicit basis for the Appellate Division’s inability to accept the trial court’s conclusion was that the Hackensack Water Company was regulated by the Board of Public Utility Commissioners and was not free of its own accord to sell or develop its uplands for residential use. Ibid. The court said, “[I]f the entire acreage must be preserved for water utility purposes, residential use may well be too remote and unfeasible to be utilized as the standard for evaluation of the land value.” Ibid. Although the Appellate Division apparently did not reverse the trial court, it remanded the matter because “the parties must be given the opportunity to produce additional evidence regarding ‘feasibility’ and ‘remoteness’ of potential residential uses in the upland acreage.” Id. at 260, 428 A.2d 934.
The problem perceived by the Appellate Division in Haworth is not present in this case. In the first place, as previously noted, Newark is not a regulated public utility and the city may sell its lands without approval of the public utility commissioners. More importantly, there was ample testimony in the present case that watershed land may be developed intensively. It is true that the subject property is one of the few undeveloped watersheds in the entire Northeast and for that reason the quality of its water is superior to the quality of water from most water systems. However, most watersheds are in fact developed, yet still provide a viable water source for consumers. All of the land in northern New Jersey is in one or another watershed. If watershed land could not be developed, there would be no development in that part of the State. Even West Milford’s environmental expert did not argue that developed watersheds should be “undeveloped.” Rather, he argued that the Newark watershed should be protected as a water source because it yields water of higher quality than it would if it were developed. For these reasons, I do not accept West Milford’s contention that Old Tappan and Haworth require a finding that the subject property’s highest and best use could be for *49 watershed purposes. See also In re East Orange, 80 N.J.Super. 219, 193 A.2d 377 (App.Div.1963), certif. den. 41 N.J. 200, 195 A.2d 468 (1963); East Orange v. Livingston, 102 N.J.Super. 512, 246 A.2d 178 (App.Div.1968), aff'd 54 N.J. 96, 253 A.2d 546 (1969); and In re East Orange, 103 N.J.Super. 109, 246 A.2d 722 (App.Div.1968) (dealing at length with the tax assessment history of a large tract known as the East Orange Water Reserve, located in Livingston Township).
This leads to the township’s second argument, that tenets of law and public policy require a conclusion that the land’s highest and best use is for water supply purposes. This point is not well-taken, however, because West Milford does not employ the term “highest and best use” in a context of property valuation. Instead, the township argues a public policy and environmental concept, that the property should remain undeveloped from the standpoint of the well-being of society, in order to preserve a unique and important ecological condition. It would be more accurate to state that when society determines that its disappearing land resources should be protected, the land is rendered incapable of being devoted to its highest and best use. Either it is taken out of the marketplace by acquisition or condemnation, as in the case of the green acres program, or it is devoted to agriculture or horticulture and assessed for taxation at less than it would be at full market value to ease the financial burden of holding the land, as in the case of farmland assessment. See New Jersey Green Acres Land Acquisition Act of 1961, N.J.S.A. 13:8A-1 et seq.; Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1 et seq. No such restrictions preclude Newark’s watershed lands from being used for the purposes for which they are zoned.
West Milford’s final point regarding highest and best use is also ill-founded. The township stresses the actual use of the property and Newark’s declared intention to continue to limit development on virtually all of its holdings in the watershed area. However, actual use is not critical, and the owner’s intention is simply not relevant. As is evident from the discus *50 sion of highest and best use above, it is fundamental that “value is dependent on use,” meaning “all possible uses,” not just actual use. Inmar Associates, Inc. v. Edison Tp., supra, 2 N.J.Tax at 64.
The fallacy in West Milford’s position is clear from a hypothetical example discussed at trial. The township’s appraiser testified that the highest and best use of a watershed tract zoned for industrial development would vary depending upon the ownership of the land. He said that generally the highest and best use of the land would be for industrial purposes, but if Newark acquired the property its highest and best use would be its use as a watershed. If Newark sold the land, according to the appraiser, its highest and best use would revert to industrial. He continued this scenario indefinitely, even stating that if a deed to the property were passed around a table among a series of new owners, the highest and best use of the property could change with the passing of the deed. This position is manifestly unsound because it involves an appraisal of the owner of property rather than of the property itself.
As I have already mentioned, the trial of this case lasted 16 days. Newark’s appraiser testified for four days on direct- and six days on cross-examination. During that time he demonstrated a mastery of an enormous amount of detail. His overall valuation approach was sound. The approach of the West Milford experts, to the contrary, was fatally flawed; their presentation was valid only to the extent that their highest and best use opinion was valid. Since I have accepted Newark’s .approach and rejected West Milford’s, I am constrained to find for Newark, by a preponderance of the evidence, in all respects.
I therefore adopt as my true value determinations the valuation determinations presented by Newark’s appraiser with respect to each block and lot under appeal and for each year under appeal. The parties have stipulated the discrimination ratios to be applied to West Milford’s assessments for each year, and discrimination relief will therefore be granted in accordance with those ratios. The only exception to the applica *51 tion of discrimination relief will be if such relief is precluded in any instance because a ratio of assessment to true value falls outside the Chapter 123 corridor for the years 1979, 1981, 1982 or 1983. See N.J.S.A. 54:51A-6.
Given the extraordinary number of blocks and lots involved in this proceeding, and the number of years at issue, counsel are directed to submit to the court, within 30 days, a schedule of agreed assessment computations pursuant to R. 8:9-3 in keeping with the terms of this opinion. The schedule should set forth as to each block and lot, and as to each relevant year: the original assessment; the county tax board judgment; the true value determination of this court; the ratio of the original assessment to true value; the stipulated ratio (and the Chapter 123 range, if applicable); and the resultant assessment. The Clerk of the Tax Court will then enter an appropriate judgment.

 The number of line items at issue for the several years varies. The specific block and lot numbers involved for each year, and the original assessment and county tax board judgment for each line item, will be set forth in the judgment to be entered as a result of this opinion.

 West Milford's zoning changed during the years at issue, but the zones in which Newark's 26 large parcels were located permitted only conservation uses or single-family residential use. Residential lot sizes varied but in no instance exceeded five acres.